LOUD *v.* SOLOMON.

1. WITNESSES—RE-EXAMINATION—DISCRETION OF COURT.
   After a witness has been examined, he may be subjected to further interrogation by the party by whom he is called; the extent of such re-examination resting largely within the discretion of the trial court.

2. SAME—ABUSE OF DISCRETION.
   Where, while plaintiff was upon the witness stand, at the close of a redirect examination, and before recross-examination began, the court asked that each counsel finish with the witness, and no further questions were asked by plaintiff's counsel, and, after a short recross-examination, plaintiff's counsel asked the privilege of asking a few more questions, the refusal of such request was not an abuse of discretion by the court.

3. FRAUD—EVIDENCE—CORPORATIONS.
   In an action upon promissory notes given in payment of stock in a cement corporation, which defendant claims he was induced to purchase by means of false and fraudulent representations as to the financial condition and property of said company, the articles of association, and the annual reports of the company to the secretary of State were properly admissible in evidence.

4. EVIDENCE—DEPOSITIONS—STOCK AND STOCKHOLDERS—VALUE OF STOCK.

A deposition of a mining engineer, offered in evidence for the purpose of showing that other plants in the immediate vicinity, started on the same plan as the corporation in which defendant purchased stock, were being successfully operated, to substantiate the representations that there was no water in the stock, that the company was well financed, and that the value of the land made the stock worth $3.50 a share, the purchase price, was inadmissible, where it does not appear from the deposition that any questions were asked as to the manner of financing the neighboring companies, the valuation which they placed upon the land taken, or the scheme of their stock issues generally, so as to show that the stock issues of those companies were not watered.

5. CORPORATIONS—STOCK—"WATERED STOCK."

"Watered" or fictitious stock is stock that is issued as fully paid up when, in fact, the whole amount of the par value thereof has not been paid in, or which purports to represent, but does not represent, in good faith, money paid into the treasury of the company, or money's worth actually contributed to the working capital of the concern.

6. EVIDENCE—CORPORATIONS—FRAUD—FULLY FINANCED.

Where defendant claimed that it had been falsely and fraudulently represented to him, in the sale of stock, that the company had been fully financed, it was not error for the court to exclude a question as to whether the company, with $3,500 in cash available, and its 400 acres of land paid for, could be made a practical or feasible scheme by the sale of stock as the plant progressed, as it could not be said that the answer would show that the company had been fully financed, where its success depended upon the uncertainty of stock sales.

7. TRIAL—INSTRUCTIONS—FRAUD—APPEAL AND ERROR.

Where the court charged the jury that it was undisputed that plaintiff's agent made substantially the same representations to defendant that plaintiff made, and the agent testified that he attempted to sell stock to defendant, at plaintiff's request, that he received his information concerning the financial condition of the company from plaintiff, and that he made the representations claimed by defendant, and plaintiff admitted that the agent assisted

in the sale of the stock, while it is doubtful whether the instruction was warranted, yet, in view of the entire charge, and the almost conclusive evidence in support of these facts, it cannot be said that the jury were misled.

Error to Iosco; Connine, J. Submitted April 21, 1915. (Docket No. 12.) Decided September 28, 1915.

Assumpsit by H. Kimball Loud against Selig Solomon and another. Judgment for defendants. Plaintiff brings error. Affirmed.

*Henry, Henry & Henry,* for appellant.

*Jaharus & Rawden* (*Joseph H. Cobb,* of counsel), for appellees.

KUHN, J. This action is brought to recover on two promissory notes, given in part payment for stock in a corporation known as the El Cajon Portland Cement Company. This company was organized in May, 1903, by the plaintiff and 15 others, with a capital stock of $500,000, divided into 50,000 shares, of a par value of $10 each. Each incorporator subscribed for 100 shares, and four of them, including the plaintiff and one Rogers, subscribed for the balance as trustees. The plaintiff and Rogers transferred to the company land owned by Rogers, which had been deeded to the Alpena County Savings Bank to secure a loan of $1,500, and 355 acres of land which had been acquired by plaintiff and Rogers for $1,100, and took in return from the company $1,000 in cash and $85,000 of the capital stock of the corporation.

After its organization the corporation entered into a contract with Mr. Rogers for the construction of its plant for $325,000 of its capital stock and $500,000 of bonds to be secured by a mortgage. It was estimated that the plant would cost $400,000, and Mr. Rogers was to undertake to sell the stock. Rogers and

others then organized a corporation known as the Rogers Construction Company, and turned this contract over to it as its principal asset. Plaintiff herein became the treasurer and general manager of the Construction Company.

In the summer of 1903 the plaintiff opened negotiations to sell the defendant stock in the Cement Company, and in January, 1904, the defendant entered into a contract with the Rogers Construction Company for the purchase of 2,000 shares of the Cement Company's stock at $3.50 per share, payment to be made partly in notes. The notes involved in this controversy are renewals of two of these notes. The notes were executed by the defendant Selig Solomon in the name of Harry Solomon, and payment guaranteed in his own name. They were of the following tenor:

"$500.00.        AU SABLE, MICH., August 1, 1904.

"January 1, 1905, after date, I promise to pay to H. Kimball Loud, or order, five hundred dollars at Dodds & McNichol's Bank, Oscoda, Michigan. Value received.
        "[Signed]    HARRY SOLOMON."

On the back of this note appeared the indorsements of Selig Solomon and H. Kimball Loud and the following guaranties:

"For value received, I, the undersigned, hereby waive protest on the within note, and guarantee payment of same.        SELIG SOLOMON."

"For value received, the undersigned hereby waive protest and demand for payment, and guarantee payment of same.        .    H. KIMBALL LOUD."

"$500.00.    Due Feb. 8th.
        "AU SABLE, MICH., Dec. 5, 1904.

"Two months after date I promise to pay to the order of H. Kimball Loud five hundred and no/100 dollars at bank of Dodds & McNichols, Oscoda, Michigan, value received.    [Signed]    HARRY SOLOMON, per."

This note was also indorsed by Selig Solomon and H. Kimball Loud, and bore this guaranty:

"For value received, I hereby guarantee the payment of the within note, and waive demand and notice of protest of same. ·        ·        H. KIMBALL LOUD.

The notes were discounted at the bank by the plaintiff, but were not paid at maturity, and were afterwards paid by the plaintiff. The defendant resisted the payment of the notes on the ground that he was induced to buy the stock of the Cement Company by false and fraudulent representations made to him by the plaintiff and one Ebling, as agent for the plaintiff. The specific representations claimed to have been made are set out in the plea of the defendant, and are as follows:

"That the said El Cajon Portland Cement Company owned 400 acres of land, for which it had paid $200 per acre; that nearly all the stock had been subscribed for by *bona fide* purchasers; that Frank W. Gilchrist and other capitalists of the city of Alpena owned a large amount of the stock; that said company was fully financed; that the property of the company made the stock worth the sum of $3.50 per share; that there was no water in the stock; and that all its lands were free and clear of indebtedness."

From a verdict and judgment of no cause of action, the plaintiff removed the case to this court for a review of alleged errors in the admission and rejection of evidence and in the charge of the trial judge.

It appears that while the plaintiff was upon the witness stand, at the close of a redirect examination and before the recross-examination began, the court stated:

"I will now ask that each counsel finish with the witness."

No further questions were thereupon asked by plaintiff's counsel, and after a short recross-examination plaintiff's counsel asked the privilege of asking the witness a few more questions, which request was not

acceded to, and the witness was excused. This refusal on the part of the court is assigned as error.

The general rule seems to be that, after a witness has been examined, he may be subjected to further interrogation by the party by whom he is called; but the extent of such re-examination rests largely within the discretion of the trial court. Here the plaintiff had been re-examined, and a recross-examination had also been held. We are not impressed that there was an abuse of discretion on the part of the trial judge in refusing counsel the privilege of further redirect examination under the circumstances here set forth. See 40 Cyc. p. 2520; *People* v. *Moran*, 65 Cal. 534 (4 Pac. 545) ; *Fowler* v. *Town of Strawberry Hill*, 74 Iowa, 644 (38 N. W. 521) ; *Anderson Transfer Co.* v. *Fuller*, 174 Ill. 221, 227 (51 N. E. 251) ; *Brown* v. *State*, 72 Md. 468, 475 (20 Atl. 186).

It is also urged that the court erred in admitting the articles of association of the company and the annual reports filed with the secretary of State. It is well established that in cases of fraud a wide range of examination is allowed, and we do not think that the examination here permitted went beyond the proper scope of inquiry. The corporation papers and the reports made to the secretary of State show who the stockholders were at the inception of the company, the stock owned by each, and also the financial condition of the company, and we are of the opinion that it was proper to show that the plaintiff was making false representations regarding the financial condition and property of this company, and that no error was committed in the admission of this evidence, in view of the claims of the defendant as to the fraudulent representations. *Millet Co.* v. *Andrews*, 175 Mich. 350 (141 N. W. 578).

It is the claim of the plaintiff that error was committed by the trial judge in not allowing proofs which

it is claimed showed that other plants in the immediate vicinity of the plant of the El Cajon Portland Cement Company, started on the same plan, were being successfully operated. For this purpose the deposition of Mr. Henry H. Hindshaw, who is a mining engineer, was offered in evidence. It is claimed that this evidence could be said to substantiate the representations that there was no water in the stock, and that the company was fully financed, and that the value of the land made the stock worth $3.50 a share. In this connection, it is well to consider what is meant by watered stock. Cook on Stock and Stockholders and Corporation Law defines it as follows:

"By watered or fictitious stock is meant stock which is issued as fully paid up, when in fact the whole amount of the par value thereof has not been paid in. If any amount less than the whole face value of the stock has not been paid, and the stock has been issued as fully paid, then the stock is watered to the extent of the deficit. Watered stock is, accordingly, stock which purports to represent, but does not represent, in good faith, money paid in to the treasury of the company, or money's worth actually contributed to the working capital of the concern." Section 13.

It is also said with reference thereto that:

"There are three different ways in which watered stock is issued: It is done by issue of certificates of stock for an amount of money less than the par value of the stock, the certificates asserting on their face that the full value has been paid in; or for property or construction work taken at a fraudulent overvaluation; or by a stock dividend, the equivalent par value of which has not been permanently added to the capital stock." Section 29.

It is the claim of the plaintiff that there was no overvaluation of the property, and that it was worth what it was represented to be for the purposes for which it was going to be used; and to show that there was no overvaluation, the testimony was offered that

there were other cement plants in the vicinity, working on the same soil at locations no more available, and that they were successful.

In our opinion, bearing in mind that the issue as presented was whether the stock was watered, the company fully financed, and the property of such a character as to make the stock worth $3.50 a share, this testimony was properly rejected as offered. To make it competent, an offer should have been made to show that, in addition to the similarity in soil and means of access to the market, the material facts in the organization of the neighboring companies were substantially the same. It does not appear from the deposition of Hindshaw, upon which the plaintiff principally relies, that any questions were asked as to the manner of financing the neighboring companies, the valuation which they placed upon the land taken, or the scheme of their stock issues generally, so as to show that the stock issues of those companies were not watered. Without proof on these points, the evidence offered could have no bearing on the issues in this case. See *Plummer* v. *Mining Co.* (C. C.), 55 Fed. 755; *Pensacola, etc., R. Co.* v. *Atkinson,* 20 Fla. 450; *Norris* v. *Clark,* 33 Minn. 476 (24 N. W. 128) ; *Mead* v. *Merrill,* 33 N. H. 437.

The witness Hindshaw was asked the following question:

"In your judgment, if the land was purchased and paid for, known as the El Cajon lands, assuming there were 400 acres, located as they are, and $3,500 in cash was available to start the construction of a cement plant, would it or would it not be a practical or feasible scheme to complete and make prosperous a cement industry by the sale of stock as the plant progressed, until it was on a paying basis?"

An objection to this question was sustained by the trial court. Assuming that the witness had qualified

himself as an expert to answer this question, concerning which there is some doubt, its only purpose could be to substantiate the representation that the company had been fully financed. However, if an answer had been allowed to the question, it could not be said that the answer would show that the company had been fully financed, as under the question as stated the success of the plant would depend upon the sale of stock as it progressed, and it certainly could not be said that it was on a solid financial basis as long as its success depended upon the uncertainty of stock sales in order to make it possible for operations to proceed.

During his charge the court said to the jury:

"It is further claimed by Mr. Solomon that Mr. Ebling, acting as the agent of Mr. Loud, also came to him and made him certain representations for the purpose of inducing him to buy this same stock. It is claimed by Mr. Solomon that substantially the same representations were made to him by Ebling that were made to him by Loud. Now, that does not seem to be disputed, as I can recall in this case, and that Mr. Ebling was the agent of Mr. Loud; and, if he was, then Mr. Loud would be bound by such representations as Mr. Ebling made."

It is claimed by the appellant that the court erred in charging the jury that it was not disputed that the same representations were made to the defendant by the plaintiff and the witness Ebling, and that Ebling was the agent of the plaintiff. At the beginning of his charge, the court stated the following:

"Now, it is my purpose to outline to you in my charge the claims that these parties make here. I do not do that for the purpose of directing you as to what your verdict shall be, nor for the purpose of intimating what the facts are, but I do it for the purpose of laying the facts before you—first, the issues of fact; and, second, the issues of law. It is your duty to accept and follow and apply to the facts the directions given you by the court; otherwise, your action might

take some illegal direction and not result justly. In speaking of the claims that the parties make here, I do not want to be understood as intimating what the facts are, or what your verdict ought to be; but I do it for the purpose of laying the issues before you."

Again he said:

"Now, the plaintiff, on the other hand, Mr. Loud, denies that he made these representations as claimed by Solomon, and he states to you what he did say to Solomon. Mr. Loud also denies that Mr. Ebling made any such representations to Solomon. So you see that gives rise to disputed questions of fact, and those questions of fact are solely for you to determine and pass upon. I haven't any right or any business to pass upon it, or decide it one way or the other. That is your duty, and it is your duty to determine whether any or all of these representations were made, and, if they were made, whether they were false. If you find they were not made, then the defense fails, and your verdict would be for the plaintiff for the amount of his notes and interest."

It also appears from the testimony of Mr. Ebling that he approached Mr. Solomon with the purpose of interesting him in the purchase of stock in this company at the request of plaintiff, and that he received such information as he possessed concerning the El Cajon Company and its financial condition from the plaintiff, for the purpose of conveying it to Solomon and inducing him to buy stock in the company. He was to receive 10 per cent. for his services in the sale of the stock. He testified that he made the representations with reference to the company and its condition, as claimed by the defendant. The plaintiff, while on the stand, in answer to questions, admitted that Mr. Ebling assisted in the sale of the stock. It may be admitted that it is doubtful whether the record warrants the statement that it was not disputed that Ebling had made the same representations to the defendant as were made to him by Loud, and that Ebling was act-

ing as the agent for Loud. Nevertheless, we are of the opinion that, in view of the entire charge as given and the almost conclusive evidence in support of these facts, it cannot be said to have been prejudicial error, as we are satisfied that what was said by the trial court did not mislead the jury.

We have examined the other assignments of error, and, deeming them to be without merit, and being satisfied that the issues here involved were properly submitted to the jury in a fair and impartial charge, and finding no prejudicial error in the record, the judgment of the trial court is affirmed.

BROOKE, C. J., and STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.